UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

———————————————————————

| | |
|---|---|
| K.K.; B.P.S.; C.S.; G.K.; | : |
| T.K., by their next friends and parents | : |
| K.K & B.P.S.; | : |
| O.H., by her next friend and natural mother C.S., | : |
| | : |
| Plaintiffs, | : |
| v. | :   No. 5:15-cv-00475 |
| | : |
| BERKS COUNTY; ASHLEA MELLINGER; | : |
| SHANNON CASE; CHRISTINE YUHASZ; | : |
| KARLA SANDERS; GEORGE M. KOVARIE; | : |
| BRANDY NEIDER, | : |
| | : |
| Defendants. | : |

———————————————————————

## MEMORANDUM OPINION

**Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, ECF No. 14 - Granted**

**Joseph F. Leeson, Jr.**                                                          **March 31, 2016**
**United States District Judge**

## I.      Introduction

This action arises out of a decision of Berks County Children and Youth Services

("CYS") to remove two children from the care of their foster parents. Plaintiffs—the foster

parents, the two foster childen, another child who is the biological son of the foster parents, and

the biological mother of one of the foster children—claim that in doing so, Berks County,

together with a number of CYS employees, violated their constitutional rights. Because Plaintiffs

have failed to state a claim upon which relief can be granted, Defendants' motion to dismiss the

Amended Complaint is granted.

Plaintiff T.K. was born in October 2010. Am. Compl. ¶ 16, ECF No. 3. His biological

father has a history of perpetrating sexual assaults and was molested as a child, and his biological

1

mother reportedly struggled with alcohol consumption during her pregnancy. Id. ¶ 17. After he was born, T.K. lived with his biological father and his grandmother pursuant to a safety plan. Id. ¶ 18. When he was ten months old, his family decided it would be in his best interest to live with his aunt and uncle, Plaintiffs B.P.S. and K.K. (for ease of comprehension, T.K will be referred to as "nephew," and B.P.S. and K.K. will be referred to as "aunt and uncle," respectively). Id. ¶ 19. Two months later, the Court of Common Pleas of Berks County granted a dependency petition filed by CYS, deeming nephew to be a dependent child in the legal custody of the state. See id. ¶ 20; Defs.' Mot. Ex. B.[1] Aunt and uncle then became their nephew's foster parents. See Am. Compl. ¶¶ 20, 24, 26. Uncle has a criminal record reflecting an arrest in 2011 for assault and weapons charges, which was dismissed, and a history of minor traffic offenses, but CYS nonetheless approved him as a foster parent. See id. ¶ 26. That same month, aunt and uncle gave birth to Plaintiff G.K ("son"). Id. ¶ 23. From that point on, aunt and uncle, together with their nephew and their son, lived together in the same household.

Eight months later, in June 2012, Plaintiff O.H. was born to nephew's father—uncle's brother—and Plaintiff C.S., her mother. Id. ¶ 31-32. Immediately after her birth, CYS placed O.H. with her aunt and uncle (O.H. will now be referred to as "niece"). Id. ¶ 33-34. As a result, aunt and uncle's household expanded to include their niece and nephew, as their foster children, and their biological son.

In February 2013, CYS received a copy of a three-year-old police report containing a rape allegation that had been made against uncle by a woman who was seventeen years old at the

---

[1]     Defendants supplied a copy of the order of the Court of Common Pleas with their Motion. "[O]n a motion to dismiss, [a court] may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999) (citing Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir.1991); United States v. Wood, 925 F.2d 1580, 1582 (7th Cir.1991)).

time.[2] Id. ¶¶ 36-37. After receiving the report, the individual Defendants, who are all CYS employees holding various positions with the agency, met to discuss it. Id. ¶ 41. They decided that niece and nephew should be removed from aunt and uncle's home, and on or about February 13, 2013, CYS removed them and placed them with alternative foster parents. Id. ¶¶ 39, 42. Three days later, CYS informed aunt and uncle that nephew could return to their home only if uncle moved out, agreed to have no contact with him, and submitted to a psychosexual evaluation. See id. ¶ 46. Aunt and uncle agreed, and nephew was returned to his aunt that day. See id. at ¶ 2. Within the next two weeks, CYS learned from the police departments that had investigated the rape allegation that it had been baseless. Id. ¶¶ 43-45. Despite that new information, CYS did not terminate the safety plan that required uncle to have no contact with his nephew, nor did CYS return niece to her aunt and uncle's home. See id. ¶¶ 50-54. Instead, on February 28, 2013, CYS referred uncle for the psychosexual evaluation, and the examiner concluded that it did "not appear that minors in his care [were] at risk." Id. ¶¶ 57-59. CYS received the results of the examination that same day, but still did not terminate the safety plan or return niece to her aunt and uncle. Id. ¶ 60.

One month later, CYS agreed to lift the safety plan, and later that year, aunt and uncle formally adopted their nephew. Id. ¶ 63. However, as of the date this action was filed, niece has remained with her alternative set of foster parents. See id. ¶ 64.

Plaintiffs claim that the actions of CYS violated a number of their constitutional rights. Specifically, they claim that they were never afforded an opportunity to challenge any of these decisions in violation of their procedural due process rights, that the decision to remove niece and nephew on the basis of a baseless rape allegation violated their substantive due process rights, that CYS interfered with their rights of association under the First Amendment, that the

---

[2]     See Br. Supp. Mot. Dismiss 2 n.1, ECF No. 14; Pls.' Br. 13 n.1, ECF No. 15.

removal of niece and nephew was an unlawful seizure in violation of the Fourth Amendment, and that these decisions were made pursuant to a policy of CYS, which means that Berks County shares liability for these violations. See id. ¶ 66.[3]

## II.     Standard of review – Motion to dismiss for failure to state a claim

The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005) (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)). This Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted).

In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Court subsequently laid out a two-part approach to reviewing a motion to dismiss under Rule 12(b)(6).

First, the Court observed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. at 678. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

---

[3]      Plaintiffs identified fourteen separate claims, but they failed to identify which claim belongs to which Plaintiff. It appears that most of the claims relate to the rights of aunt and uncle, as foster parents, and niece and nephew, as their foster children. As for the other two Plaintiffs—aunt and uncle's biological son, G.K., and niece's biological mother, C.S.—it appears that they are each advancing a claim for the violation of their respective rights of association under the First Amendment. See Am. Compl. ¶ 66(XIII), 66(XIV).

suffice" to survive the motion; "instead, 'a complaint must allege facts suggestive of [the proscribed] conduct.'" Id.; Phillips, 515 F.3d at 233 (quoting Twombly, 550 U.S. at 563 n.8). While Rule 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," was "a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 556 U.S. at 678-79 ("Rule 8 . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (citing Twombly, 550 U.S. at 555)); see Fed. R. Civ. P. 8(a)(2). For "without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." Phillips, 515 F.3d 224, 232 (citing Twombly, 550 U.S. at 555 n.3).

Second, the Court emphasized, "only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 678. Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 555). This is because Rule 8(a)(2) "requires not merely a short and plain statement, but instead mandates a statement 'showing that the pleader is entitled to relief.'" See id., 515 F.3d at 234 (quoting Fed. R. Civ. P. 8(a)(2)). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "Detailed factual allegations" are not required, id. at 678

(quoting <u>Twombly</u>, 550 U.S. at 555), but a claim must be "nudged . . . across the line from conceivable to plausible," <u>id.</u> at 680 (quoting <u>Twombly</u>, 550 U.S. at 570).

"The plausibility standard is not akin to a 'probability requirement,'" but there must be "more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> at 678 (quoting <u>Twombly</u>, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557)).

**III.    Analysis**

**A.    Unless a constitutional right was clearly established at the time of the challenged conduct, individual state actors are protected from suits for damage. The constitutional rights of kinship foster parents and their foster children in this case were not clearly established.**

Parents have "constitutionally protected liberty interests" in the "custody, care and management of their children." <u>Croft v. Westmoreland Cty. Children & Youth Servs.</u>, 103 F.3d 1123, 1125 (3d Cir. 1997) (citing <u>Lehr v. Robertson</u>, 463 U.S. 248, 258 (1983)); <u>Myers v. Morris</u>, 810 F.2d 1437, 1462 (8th Cir. 1987)). These rights are not absolute, but "[t]he Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process." <u>Id.</u>

Whether foster parents have similar liberty interests in the custody, care, and management of their foster children is not so readily apparent. The liberty interest that families possess in their privacy and autonomy arise not as a matter of state law, "but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" <u>Smith v. Org. of Foster Families For Equal. & Reform</u>, 431 U.S. 816, 845 (1977) (quoting <u>Moore v. City of E. Cleveland</u>, 431 U.S. 494, 503 (1977)). By contrast, "[w]hatever emotional ties may develop

between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset." Id. When the state interferes with a foster family, the state is not interfering "with a relationship having its origins entirely apart from the power of the State," but rather with a family that "has its source in state law and contractual arrangements." Id. The nature and extent of the liberty interests possessed by foster families, if any, must therefore be derived from "the expectations and entitlements of the parties" under state law, and not the Due Process Clause. See id. at 845-46; Rodriguez v. McLoughlin, 214 F.3d 328, 337 (2d Cir. 2000) ("[A]ny liberty interest arising in the preservation of a biologically unrelated foster family would arise, if at all, only under state law."); Procopio v. Johnson, 994 F.2d 325, 328 (7th Cir. 1993).[4]

While the possibility therefore exists that state law could afford foster families constitutionally protected interests, "attempt[s] to establish a due process liberty interest between foster parents and children have continued to fail." Kevin B. Frankel, The Fourteenth Amendment Due Process Right to Family Integrity Applied to Custody Cases Involving Extended Family Members, 40 Colum. J.L. & Soc. Probs. 301, 333 (2007). One court, considering the question under New York law, found that state law did not afford a foster family a constitutionally protected liberty interest in the integrity of their relationship, which meant that their rights were not violated when the state allegedly removed the foster child without adequate justification and without providing notice and an opportunity to be heard. See Rodriguez, 214 F.3d at 339-41. Another court, recognizing that Illinois law affords the state the "ultimate prerogative to terminate the foster family unit," also declined to recognize the existence of any

---

[4]      But see Elwell v. Byers, 699 F.3d 1208, 1217 (10th Cir. 2012) (finding that foster parents who had received court approval for their proposed adoption plan possessed a protectable liberty interest that was implicated when the foster child was removed based on an incident that occurred one month prior to the date of their final adoption hearing). The court nonetheless dismissed the foster parents' claims for violations of their procedural and substantive due process rights because, up until that decision, "no court had answered whether preadoptive parents in [their] position possessed a liberty interest in familiar association." Id. at 1219.

liberty interest in a foster family's relationship, which meant that the family was not entitled to notice and an opportunity to be heard before the state removed the foster child and transferred custody of her back to her biological mother. See Procopio, 994 F.2d at 329-30 (observing that the court had previously reached the same conclusion under Indiana law). Others still have reached similar conclusions under the laws of Florida, see Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 814 (11th Cir. 2004), Ohio, Renfro v. Cuyahoga Cty. Dep't of Human Servs., 884 F.2d 943, 944 (6th Cir. 1989), and Georgia, see Drummond v. Fulton Cty. Dep't of Family & Children's Servs., 563 F.2d 1200, 1206-07 (5th Cir. 1977) (en banc). See also Wildauer v. Frederick Cty., 993 F.2d 369, 373 (4th Cir. 1993) (concluding, without reference to state law, that a foster parent did not have any constitutionally protected liberty interest in retaining possession of her foster children).[5]

---

[5]     In Long v. Holtry, 673 F. Supp. 2d 341, 348 (M.D. Pa. 2009), the court found that Pennsylvania law affords foster parents a protectable liberty interest because a state regulation requires foster parents to receive advance written notice before a foster child is relocated. See id. at 348 (citing 55 Pa. Code § 3700.73(b), (e)). The court found that the regulation's use of "explicit mandatory language . . . compel[led] the conclusion that the state created a liberty interest protected by the due process clause of the 14th Amendment." Id. Without due process protection, the court reasoned, the statutory right to prior notice "would be meaningless." See id. at 348 n.3. For support, the court cited to McLaughlin v. Pernsley, 693 F. Supp. 318, 326 (E.D. Pa. 1988), which reached the same conclusion based on the notice and appeal rights provided to foster parents by § 3700.73. See id. at 326 ("This regulation uses language of an unmistakably mandatory character requiring that certain procedures 'shall' or 'must' be employed.").

However, the fact that the state has created a set of mandatory procedures that must be followed is not sufficient to create a liberty interest. "Process is not an end in itself," and if "state law creates a mandatory procedure but does not guarantee a particular substantive outcome, it does not confer a protected liberty interest." Elwell, 699 F.3d at 1214 (citing Olim v. Wakinekona, 461 U.S. 238, 249 (1983), abrogated on other grounds, Sandlin v. Conner, 515 U.S. 472, 483-84 & n.5 (1995)). "[T]he state may choose to require procedures for reasons other than protection against deprivation of substantive rights," and if the state does no more than put certain procedures in place, "the State does not create an independent substantive right." Stephany v. Wagner, 835 F.2d 497, 500 (3d Cir. 1987) (quoting Olim, 461 U.S. at 250)). The fact that state law may entitle foster parents to certain procedural rights does not, therefore, determine whether the state has created an interest protected by the Due Process Clause. Instead, "the dispositive question in determining whether a state rule creates a protected liberty interest is whether it 'plac[es] substantive limitations on official discretion.'" Id. (quoting Olim, 461 U.S. at 249). Section 3700.73 does not purport to limit the state's discretion of whether to remove a foster child from a foster home or direct any particular outcome; it only provides foster parents with advance notice and the right to challenge the decision. Because that regulation does not place any "substantive limitations on official discretion," it cannot be the basis for finding the existence of a protectable liberty interest. At least two courts of appeals have reached this same conclusion under similar state laws. See Elwell, 699 F.3d at 1214-15 (concluding that a state statute that required foster parents to receive advance notice before a foster child could be removed did not create a protectable liberty interest because "it simply mandate[d] procedures that must be followed prior to removal" without placing any limits on the state's exercise of discretion); Rodriguez, 214 F.3d at 339-41 (finding that a variety of procedural safeguards provided to

Aunt and uncle, however, contend that they are not ordinary foster parents because they are related to their foster children. They argue that because their relationship does not owe its origin solely to "state law and contractual arrangements," see Smith, 431 U.S. at 845, they have constitutionally protectable interests that typical foster families do not. At least one court has agreed. In Rivera v. Marcus, 696 F.2d 1016 (2d Cir. 1982), two young children were living in a household with their mother and their adult half-sister. Id. at 1017-18. Their mother suffered from mental illness, and so, with their mother's consent, their half-sister assumed much of the parenting responsibilities. Id. After living together for approximately two years, their mother's illness worsened, and she entered a psychiatric facility. Id. at 1018. A state juvenile court proceeded to transfer legal custody of the children to the state, and the state asked the half-sister if she would be interested in serving as their foster parent. Id. She agreed and began serving as the children's foster parent. Id. Approximately ten months later, the state notified her that it had decided to remove the children from her care. Id. By this time, the children had been living with their half-sister continuously for approximately six years. Id. Under state law, she was afforded an opportunity to challenge the decision before an administrative tribunal, which decided against her. Id. She then sought relief in federal court, claiming that the procedures the state followed violated her due process rights. Id. at 1019-20. On appeal, the court recognized that her claims "d[id] not fit neatly into the bodies of law governing the rights of either foster or natural parents" but rather were a hybrid of the two. Id. at 1017. She was acting as the children's foster parent,

---

foster parents under New York law did not create a protectable liberty interest because "none of the statutory or regulatory sections . . . contain[ed] any substantive predicates or explicitly mandatory language giving directives to decisionmakers").

and the state had explicitly reserved the right to remove the children at any time, but their

circumstances were nonetheless quite different from the ordinary foster family:

> [The half-sister] is related biologically to the . . . children. They lived together as a family for several years <u>before</u> the foster care agreement was consummated. Finally, there is not the potential for conflict with the rights of the natural parents of the . . . children. The natural father has shown no interest in the children in more than twelve years. [Their mother] expressly asked [their half-sister] to care for her children and, in light of [their mother's] deteriorating mental condition, there is very little likelihood that she will ever leave the institution she entered . . . .

<u>Id.</u> at 1024. Under those circumstances, the court found that the children's half-sister

"possess[ed] an important liberty interest in preserving the integrity and stability of her family,"

which entitled her to due process protections when the state decided to remove the children from

her home. <u>See</u> <u>id.</u> at 1024-25.

Here too, the relationship between aunt and uncle and their niece and nephew cannot be

described simply as a foster family. Their emotional ties cannot be said to have their origins

solely "in an arrangement in which the State has been a partner from the outset." <u>See</u> <u>Smith</u>, 431

U.S. at 845. The decision to have nephew live with his aunt and uncle was originally made by

the family, not the state, and for the first two months (until his custody was transferred to the

state), he was simply living with his aunt and uncle, not foster parents.

At the same time, there are important differences between the circumstances here and

those that the court took note of in <u>Rivera</u>. There, the foster children had been living with their

half-sister for several years before she took on the role of their foster parent. Here, niece and

nephew had been living with their aunt and uncle for, at most, two months before their custody

was awarded to the state and their relationship as a foster family began. In addition, the state was

already involved in nephew's care before the family decided that he should live with his aunt and

uncle. Immediately after he was born, his living arrangements were governed by a safety plan

that provided for him to live with his biological father and grandmother, and that plan appears to have remained in place until he moved to the home of his aunt and uncle. <u>See</u> Am. Compl. ¶¶ 18-19. Constitutional protection for familial integrity draws from recognition that "freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause" and that there is a "private realm of family life which the state cannot enter." <u>See</u> <u>Smith</u>, 431 U.S. at 842 (citing <u>Cleveland Bd. of Educ.</u>, 414 U.S. at 639-40; <u>Prince v. Massachusetts</u>, 321 U.S. 158, 155 (1944)). But here, the state did not intrude upon a purely private "choice of relatives . . . to live together." <u>Cf.</u> <u>Moore</u>, 431 U.S. at 505-06. Rather, the state appears to have been involved in the decisions of how to structure the family environment for both niece and nephew since the time of their births.

Also unclear is the role of niece and nephew's biological parents at the time that the foster family contends that that they had a protected interest in their familial integrity. Biological parents retain a fundamental liberty interest in the care, custody, and management of their offspring that "does not evaporate simply because they . . . have lost temporary custody of their child to the State." <u>See</u> <u>Santosky v. Kramer</u>, 455 U.S. 745, 753 (1982). Affording a foster family a protected liberty interest in their familial integrity is difficult to reconcile with those rights held by the child's biological parents. <u>See</u> <u>Smith</u>, 431 U.S. at 846. In <u>Rivera</u>, this tension was alleviated by the fact that the children's father had "shown no interest in the children in more than twelve years" and that "there [was] very little likelihood that [their mother would] ever leave the institution she entered." <u>See</u> 696 F.3d at 1024. Here, while nephew's father had agreed to give up his parental rights before the time that the state removed nephew from his aunt and uncle's home, <u>see</u> Am. Compl. ¶ 28, there is no indication that his mother had also agreed to forfeit her parental rights prior to that time. With respect to niece, Plaintiffs allege that her

biological parents wished for her to continue living with her aunt and uncle at the time that the state removed her from their home, but there is no indication of whether her biological parents had agreed to forfeit their parental rights at that time. See id. ¶ 48.

These factual differences give reason for pause, particularly because the Second Circuit recently cast doubt upon the breadth of Rivera's holding. See Haynes v. Johnson, No. 14-3999, 2015 WL 6457738, at *2 (2d Cir. Oct. 27, 2015). The court recognized that the Rivera court had emphasized the unique facts of that case, particularly the fact that "the foster child and foster parents had lived together as a family for several years prior to the foster care agreement and that the natural parents had shown no interest in the child in more than 12 years." See id. The court concluded from this review that "it is not clear whether Rivera established a categorical liberty interest for kinship foster parents or whether the liberty interest it found depended on the individual circumstances of the case" and that, at the least, "it is not at all clear" that other kinship foster families would possess the same kind of protected liberty interest that Rivera recognized. See id.; see also Gabrielle A. Paupeck, When Grandma Becomes Mom: The Liberty Interests of Kinship Foster Parents, 70 Fordham L. Rev. 527, 548 (2001) (observing that "facts of Rivera entail[ed] an extremely intense kind of kinship relationship"). In light of the differences between the present facts and those of Rivera, it is not readily apparent whether the logic of that decision would afford this foster family the same type of liberty interest.

**B.     Case law in the Third Circuit**

More problematic, however, is that neither the Third Circuit nor any court in this circuit appears to have considered whether kinship foster parents are entitled to rights that ordinary foster parents are not. Unless a constitutional right was "'clearly established' at the time of the challenged conduct, individual state actors are protected from suits for damages. Ashcroft v.

al-Kidd, 131 S. Ct. 2074, 2080 (2011). Only if "'[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right'" can a right be said to have been clearly established. See id. at 2083 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (alterations in original). The ultimate question that must be answered, therefore, is "whether 'reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be unlawful.'" See Giuffre v. Bissell, 31 F.3d 1241, 1255 (3d Cir. 1994) (quoting Abdul-Akbar v. Watson, 4 F.3d 195, 202 (3d Cir. 1993)).

## C.    Case law in the other circuits

Had the other circuits reached a level of consensus that kinship foster families possess some liberty interests, there might have been a closer question of whether a reasonable official in the position of the CYS employees would have known that interfering with a hybrid foster family such as this one would demand careful navigation of those interests. See Williams v. Bitner, 455 F.3d 186, 192 (3d Cir. 2006) (acknowledging that the court "routinely consider[s] decisions by other Courts of Appeals as part of [its] 'clearly established' analysis"). But see Johnson v. Horn, 150 F.3d 276, 286 (3d Cir. 1998) (recognizing that the circuits have split over the "difficult question" of whether "out-of-circuit decisions may be considered in determining whether the law was clearly established"), overruled on other grounds by DeHart v. Horn, 227 F.3d 47 (3d Cir. 2000). However, this question has received very little attention in any circuit. See Paupeck, supra, at 548 (observing that in twenty years since the Second Circuit decided Rivera, the question of whether kinship foster parents possess protectable liberty interests had generated "little subsequent history" and that the Second Circuit's decision had "rarely even been cited"). Other than the Second Circuit, no other circuit appears to have ruled upon the

liberty interests of kinship foster families. This issue has also generated scant attention from the district courts—attention which appears to have been confined almost exclusively to decisions from the Second Circuit's district courts following the guidance of <u>Rivera</u>.[6] Indeed, Plaintiffs failed to cite to a single decision of any court on this topic.

<u>Rivera</u> and the few decisions of the Second Circuit's district courts that have followed do not place the constitutional question in this case "beyond debate," <u>see</u> <u>al-Kidd</u>, 131 S. Ct. at 2083 (citing <u>Anderson</u>, 483 U.S. at 640; <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)), particularly in light of the Second Circuit's recent reluctance to conclude that <u>Rivera</u> endorsed a categorical liberty interest for all kinship foster families.

This is particularly true in light of the consensus that has developed that ordinary foster families do not possess constitutionally protected liberty interests. A reasonable CYS employee could not be expected to have known that interacting with this type of hybrid foster family may have carried with it the risk of violating constitutional interests that are not present when dealing with an ordinary foster family. Even assuming that the Plaintiffs may possess some of the due

---

[6]      <u>See</u> <u>Haynes v. Mattingly</u>, No. 06-cv-1383, 2014 WL 4792241, at *11 (S.D.N.Y. Sept. 24, 2014) (finding that <u>Rivera</u> guaranteed a great-aunt a liberty interest as a foster parent); <u>Renaud v. Mattingly</u>, No. 09 CV9303, 2010 WL 3291576, at *5 (S.D.N.Y. Aug. 10, 2010) (finding that <u>Rivera</u> guaranteed an aunt a liberty interest as a foster parent); <u>Rivera v. Mattingly</u>, 604 F. Supp. 2d 634, 638 (S.D.N.Y. 2009) (finding that <u>Rivera</u> guaranteed a grand-aunt a liberty interest as a foster parent); <u>Balbuena v. Mattingly</u>, No. 05 CIV. 2986, 2007 WL 2845031, at *6 (S.D.N.Y. Sept. 28, 2007) (finding that <u>Rivera</u> guaranteed an aunt a liberty interest as a foster parent); <u>Johnson v. City of N.Y.</u>, No. 99CIV.0048, 2003 WL 1826122, at *7 (S.D.N.Y. Apr. 8, 2003) (finding that <u>Rivera</u> guaranteed a grandparent a liberty interest as a foster parent; <u>Harley ex rel. Johnson v. City of N.Y.</u>, 36 F. Supp. 2d 136, 140 (E.D.N.Y. 1999) (finding that <u>Rivera</u> guaranteed a grandparent a liberty interest as a foster parent); <u>Thomas v. Illinois</u>, No. 02 C 4956, 2002 WL 1632373, at *2 (N.D. Ill. July 23, 2002) ("[It] is not clear what rights and due process are afforded a foster parent who is a biological relative of the foster children."); <u>A.C. v. Mattingly</u>, No. 05 CV 2986, 2007 WL 894268, at *5 (S.D.N.Y. Mar. 20, 2007) (finding that <u>Rivera</u> guaranteed an aunt a liberty interest as a foster parent). Notably, each of these decisions from the Second Circuit's district courts, which relied upon <u>Rivera</u> for the principle that kinship foster families possess protectable liberty interests, was reached before the Second Circuit recently questioned "whether <u>Rivera</u> established a categorical liberty interest for kinship foster parents or whether the liberty interest it found depended on the individual circumstances of the case." <u>See</u> <u>Hayes</u>, 2015 WL 6457738, at *2.

process rights that they seek to vindicate, they were not clearly established at the time, and the individual Defendants are therefore immune to these claims.[7]

This same conclusion applies to the Plaintiffs' claims under the First Amendment. Initially, it does not appear that the First Amendment offers any protections in this context in addition to, or separate from, the right to familial association that is protected by the Due Process Clause. While the right to familial association has not been delineated with a high level of particularity, see Patel v. Searles, 305 F.3d 130, 133 (2d Cir. 2002) ("Like the wind that blows where it wills and can be heard, yet no one knows "from where it cometh and whither it goeth" John 3:8, this constitutional right is real despite the lack of exact knowledge regarding its derivation and contours."), the Supreme Court "ha[s] referred to constitutionally protected 'freedom of association' in two distinct senses:

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

---

[7]   For this same reason, uncle's claim that Defendants interfered with his right to associate with his biological son also fails against the individual Defendants. Uncle claims that three days after his niece and nephew were removed, CYS agreed to allow his nephew to return only if uncle agreed to have no contact with his nephew pursuant to a safety plan. See Am. Compl. ¶¶ 2, 46. He claims that this safety plan "effectively required [him] to leave the family home and be separated from his son." See id. ¶ 2. The Third Circuit has observed that there is "no rational distinction" between a state removing a child from the family home and ordering a parent to leave the home under threat of removing the child if the parent does not comply, because either course of action necessarily infringes upon the family's protected right to familial integrity. See Croft v. Westmoreland Cty. Children & Youth Servs., 103 F.3d 1123, 1125 n.1, 1126 n.4 (3d Cir. 1997). Here, however, the state did not threaten to remove uncle's biological child if he did not leave the family home. Rather, agreeing to the safety plan was a condition for the state the return his foster child to the home. The right at issue is not uncle's right to care and custody of his biological child, but rather the right—if it exists—to maintain the integrity of his kinship foster home. Because that right is not clearly established, his claim against the individual Defendants is barred by qualified immunity.

Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984). The rights of association that the Plaintiffs seek to vindicate appear to be the former, not the latter, because "[f]amily relationships are the paradigmatic form of protected intimate associations." See Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 441 (3d Cir. 2000); cf. Winston v. Children & Youth Servs. of Delaware Cty., 948 F.2d 1380, 1392 (3d Cir. 1991) (finding that a state policy "d[id] not violate a parent's constitutional right to familial association whether viewed from the standpoint of the Fourteenth Amendment or the First Amendment"). Nonetheless, some courts have been willing to entertain claims under the First Amendment by parents whose children were removed from them by the state. See, e.g., D.M. v. Cty. of Berks, 929 F. Supp. 2d 390, 399 (E.D. Pa. 2013); Doe v. Fayette Cty. Children & Youth Servs., No. CIV.A. 8-823, 2010 WL 4854070, at *18 (W.D. Pa. Nov. 22, 2010) (citing Roberts for the proposition that "[t]here are two types of association protected by the First Amendment: expressive and intimate"); Behm v. Luzerne Cty. Children & Youth Policy Makers, 172 F. Supp. 2d 575, 585 (M.D. Pa. 2001) ("First Amendment freedom of association includes the right to intimate association.").

Roberts appears to compel the conclusion that the proper place for these sorts of claims is under the Due Process Clause, not the First Amendment. But even if a claim under the First Amendment is cognizable in this context, the individual Defendants are still entitled to qualified immunity for the same reasons that they are entitled to the immunity against Plaintiffs' due process claims. Regardless of whether the source for this right lies under the First Amendment or the Fourteenth, the right to familial association that may exist in the context of a kinship foster family, to the extent it would exist under these circumstances, has not been clearly established.[8]

---

[8]      With respect to the claim of C.S., niece's mother, that her associational rights with her daughter were violated, she offers no response to Defendants' argument that her claim must fail because she was not living with and did not have custody over her daughter at the time that her daughter was removed from her aunt and uncle's home. See Br. Supp. Mot. Dismiss 13, 15 n.15. While a biological parent's interest "does not evaporate simply

**IV.     Niece and Nephew have failed to state a claim for the violation of their Fourth Amendment rights in connection with their removal from their foster parents' home.**

Niece and nephew contend that their Fourth Amendment rights were violated when they were removed from their aunt and uncle's foster home.[9] Some courts have held that "[w]hen a child is taken into state custody, his or her person is 'seized' for Fourth Amendment purposes," which affords the child the right to claim that the seizure was unreasonable within the meaning of the Amendment.[10] Southerland v. City of N.Y., 680 F.3d 127, 143 (2d Cir. 2012); Brokaw v. Mercer Cty., 235 F.3d 1000, 1010 (7th Cir. 2000) (collecting cases); D.M. v. Cty. of Berks, 929 F. Supp. 2d at 400. These courts reason that because a child who is taken into state custody "would have believed that he was not free to leave," the child has been seized for Fourth Amendment purposes. See Brokaw, 235 F.3d at 1010; Tenenbaum v. Williams, 193 F.3d 581, 602 (2d Cir. 1999).

---

because they . . . have lost temporary custody of their child to the State," see Santosky, 455 U.S. at 753, nor do "[p]arental rights . . . spring full-blown from the biological connection between parent and child. They require relationships more enduring," see Lehr v. Robertson, 463 U.S. 248, 260 (1983) (quoting Caban v. Mohammed, 441 U.S. 380, 397 (1979) (Stewart, J., dissenting)). Here, the state took custody of C.S.'s daughter immediately after her birth and placed her in the foster care of her aunt and uncle. See Am. Compl. ¶ 33. The only indication in the Amended Complaint that C.S. has had any involvement with her daughter is the allegation that she wished for her daughter to reside with her aunt and uncle. See id. ¶ 48.

    Whatever the precise nature of the rights that a biological parent retains over a child in state custody, those rights are attenuated when custody is lost. See, e.g., Wilder v. Bernstein, 848 F.2d 1338, 1346 (2d Cir. 1988) (observing that while parents have an interest in their children's religious upbringing, "[i]t is quite another matter . . . to suggest that parents who are unable to fulfill their parental obligations, thereby obliging the state to act in their stead, at their request or involuntarily, nonetheless retain a constitutional right to insist that their children receive state-sponsored parenting under the religious auspices preferred by the parents"). Even assuming that a biological parent may have a protectable liberty interest in the selection of foster parents for her child, C.S. has pointed to no authority for the proposition that the state infringes that interest when it removes the foster child from the parent's preferred foster home while investigating the safety of the that environment or that, under these circumstances, such a right is clearly established.

[9]    "A Fourth Amendment child-seizure claim belongs only to the child, not to the parent, although a parent has standing to assert it on the child's behalf." D.M. v. Cty. of Berks, 929 F. Supp. 2d at 400 (quoting Southerland v. City of N.Y., 680 F.3d 127, 143 (2d Cir. 2012)).

[10]    This type of Fourth Amendment claim, possessed by child, should be understood as a substitute for a more generalized claim that the seizure violated the child's substantive due process rights, rather than an additional claim that can be brought alongside a claim for violation of the child's substantive due process rights. See Southerland, 680 F.3d at 143 ("For child removal claims brought by the child, we have concluded that the Constitution provides an alternative, more specific source of protection than substantive due process. When a child is taken into state custody, his or her person is 'seized' for Fourth Amendment purposes.").

However, there must be another limiting principle in this context, because for children it is the exception, not the rule, for them to believe they are free to leave whoever presently has physical custody over them. That limiting principle appears to be that a child is seized for the purposes of the Fourth Amendment only if the state has removed a child from a person who presently has legal custody of the child. Hunt v. Green, 376 F. Supp. 2d 1043, 1057-58 (D.N.M. 2005) ("For the Court to require, under the Fourth Amendment, a warrant or court order to change physical custody would be to largely erase the distinction between legal and physical custody. There are good reasons to require a warrant or court order when . . . the state is removing children from parents or others who have legal custody. There is no such compelling reason for judicial action where the state is changing foster parents or physical guardians."). Accordingly, the few courts to have considered "whether the Fourth Amendment is implicated when a state that has legal custody of a child makes a change in the child's physical custody . . . have answered in the negative." A.C. v. Mattingly, No. 05 CV 2986, 2007 WL 894268, at *6 (S.D.N.Y. Mar. 20, 2007) (citing Hunt, 376 F.Supp.2d 1043; Gedrich v. Fairfax Cty. Dep't of Family Servs., 282 F.Supp.2d 439 (E.D. Va. 2003)).

The fact that a child may be in the home of a kinship foster family rather than an ordinary foster family does not change the outcome. Under both scenarios, the state has legal custody over the child. Indeed, even those few courts that have recognized that kinship foster families have protectable liberty interests in their familial integrity are mostly in agreement that the Fourth Amendment is not implicated if the state removes the kinship foster child from the foster home. See Haynes v. Mattingly, 2014 WL 4792241, at *15 ("[T]he removal of a foster child from the home of a kinship foster parent is not a Fourth Amendment Seizure."); Rivera v. Mattingly, 2011 WL 4344422, at *11 ("Plaintiffs fail to persuade the court that the Fourth Amendment is

implicated after a child is in the State's legal custody."); <u>A.C. v. Mattingly</u>, 2007 WL 894268, at

*6 ("Since infant plaintiffs were in the legal custody of the state when removed from their aunt,

infant plaintiffs' Fourth Amendment claim is dismissed."). <u>But see</u> <u>Renaud</u>, 2010 WL 3291576,

at *8 (considering whether the state violated the Fourth Amendment when it removed a kinship

foster child but finding that the state did not violate the child's rights because probable cause

existed to support the removal). Accordingly, niece and nephew's Fourth Amendment rights

were not implicated when they were removed from their aunt and uncle's home.[11]

**V.      Plaintiffs have failed to state a plausible claim against Berks County.**

When a municipality is charged with liability for a constitutional violation pursuant to

§ 1983, liability can attach to the municipality only "where the municipality <u>itself</u> causes the

constitutional violation at issue." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 385 (1989)

(citing <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694-95 (1989)). Thus, the municipality

cannot be held liable simply because it employs a constitutional tortfeasor, which would amount

to liability premised on the theory of respondeat superior. <u>See</u> <u>id.</u> Instead, there must be a "direct

causal link between a municipal policy or custom and the alleged constitutional deprivation."

<u>See</u> <u>id.</u>

The sole allegations that Plaintiffs make against Berks County consist of a citation to a

case from this district involving the allegation that CYS "has a widespread custom of prohibiting

suspected abusers from having contact with their children until the completion of an offender

evaluation" without providing a prompt hearing. <u>See</u> <u>D.M. ex rel. J.M. v. Cty. of Berks</u>, 27 F.

Supp. 594, 607 (E.D. Pa. 2014); Am. Compl. ¶¶ 56-57. Plaintiffs' allegations are insufficient to

state a plausible claim against Berks County for two reasons. The first is that the court in <u>D.M.</u>

---

[11]      Even if the removal of niece and nephew implicated their Fourth Amendment rights, the individual
Defendants would be entitled to qualified immunity.

ex rel. J.M. did not adjudicate the merits of those allegations against CYS. Rather, the court concluded only that there were sufficient facts to deny Berks County's motion for summary judgment on those claims. See id. at 607-08. Second, even assuming that the allegations that were made in that case can be taken as true, the CYS policy that was allegedly followed in that case was applicable to different circumstances than these. There, CYS had required the parents of three biological children to make arrangements for the children to be housed elsewhere while CYS investigated allegations that the children had been abused when they were minors. According to the plaintiffs in that case, the CYS employees were following a CYS policy of prohibiting parents from having contact with their own children while an investigation is conducted without affording them a prompt hearing. See id. at 597-98. Here, by contrast, CYS is alleged to have removed two foster children from a foster home under the agency's auspices while it investigated an allegation of rape that had been made against one of the foster parents. That CYS may have had a policy that governed investigations into parents who are suspected of being a risk to their own children is not indicative of whether CYS had a policy governing the steps that its employees were required to take when a foster parent—approved by the agency— was suspected of being a danger to a foster child that CYS had placed in the foster parent's home, or that such a policy failed to account for Plaintiffs' rights. Nor do Plaintiffs' allegations plausibly allege that the individual Defendants were acting in accordance with such a policy during the events in question. See Burke v. Twp. of Cheltenham, 742 F. Supp. 2d 660, 675 (E.D. Pa. 2010) (observing that a municipality cannot be held liable if a constitutional violation was the result of "idiosyncratic actions of individual public actors" rather than actions taken in conformance with an established policy or custom).

Based on the briefing that Plaintiffs have submitted, it does not appear that they are in possession of any additional facts to make out a plausible claim against Berks County.[12] Nonetheless, in light of the Third Circuit's clear direction that "a district court must permit a curative amendment unless such an amendment would be inequitable or futile," and "must provide the plaintiff with this opportunity even if the plaintiff does not seek leave to amend," see Phillips v. Cty. of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008), Plaintiffs may amend their complaint if they are in possession of facts sufficient to impose liability on Berks County—and if such a claim would be consistent with the rest of this Memorandum Opinion. Plaintiffs should bear in mind that liability can attach only if they can successfully "identify a custom or policy, and specify what exactly that custom or policy was," McTernan v. City of York, Pa., 564 F.3d 636, 658 (3d Cir. 2009), and that "bare recitation of the words 'custom and/or policy,'" Pittman v. Martin, 569 F. App'x 89, 92 (3d Cir. 2014), or "vague assertions of policy are not sufficient to impose liability under Monell," Tripodi v. N. Coventry Twp., 616 F. App'x 521, 523 (3d Cir. 2015) (citing Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995)). See also Bayer v. Monroe Cty. Children & Youth Servs., 414 F. App'x 431, 437 (3d Cir. 2011) (rejecting a conclusory allegation that "Monroe County/MCCYS has a policy, custom, or practice of 'seiz[ing] minor children from their parents without prior judicial authorization, and without any reasonable basis to believe such a seizure is necessary to protect children from imminent harm'" as insufficient to state a claim).

---

[12]     Defendants argued in their briefing that Plaintiffs' exclusive reliance on the decision of the court in D.M. ex rel. J.M. was not sufficient to sustain their claim against Berks County. See Br. Supp. Mot. Dismiss 22-23. Plaintiffs' only response to this argument was to contend that their citation to that decision was sufficient to state a claim, see Pl.'s Br. 20-22, and they did not give any indication that they are in possession of any additional facts not included in their Amended Complaint.

**VI.      Conclusion**

Plaintiffs have failed to a state a claim against the individual Defendants. The Amended Complaint also fails to state a claim against Berks County, but Plaintiffs are afforded leave to amend to support their claim with sufficient factual allegations if they are able.


BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge